**SCOTTSDALE INS. CO, Plaintiff,**

v.

**SAFECO INS. CO. OF AM., Defendant.**

**No. CIV.A.99–D–1008–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

Aug. 10, 2000.

Mark W. Lee, Dorothy A. Powell, Parsons, Lee & Juliano, P.C., Birmingham, AL, for Plaintiff.

William H. Webster, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, for Defendant.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are two Motions For Summary Judgment filed by Plaintiff and Defendant ("Pl.'s Mot." and "Def.'s Mot.," respectively), on May 24, 2000.[1] After careful consideration of the arguments of counsel, the relevant law, and the record

---

1. Along with its Motion, Plaintiff filed a Memorandum Brief In Support Of Motion For Summary Judgment ("Pl.'s Br."). Along with its Motion, Defendant filed a Brief In Support Of Motion For Summary Judgment ("Def.'s Br."). On June 9, 2000, Plaintiff filed a Response To Defendant's Motion For Summary Judgment ("Pl.'s Resp.") and Defendant filed a Brief In Response To Plaintiff's Motion For Summary Judgment ("Def.'s Resp."). Defendant filed a Reply Brief In Support Of Its Motion For Summary Judgment on June 15, 2000 ("Def.'s Reply"). The following day, June 16, 2000, Plaintiff filed a Reply To Defendant's Brief In Response To Plaintiff's Motion For Summary Judgment ("Pl.'s Reply").

as a whole, the court finds that Plaintiff's Motion For Summary Judgment is due to be denied and Defendant's Motion For Summary Judgment is due to be granted.

## JURISDICTION AND VENUE

The court has subject matter jurisdiction over this lawsuit under 28 U.S.C. §§ 1332 and 2201.[2] The parties do not contest personal jurisdiction or venue.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." FED. R. CIV. P.

---

**2.** Under the Declaratory Judgment Act, a district court, generally, "may declare the rights and other legal relations of any interested party seeking such declaration" in any case in which an actual controversy exists that is within the district court's jurisdiction. 28 U.S.C. § 2201(a).

56(e); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. An action is void of material issues for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## BACKGROUND

The parties do not dispute the material facts. On February 26, 1996, Evans Realty, Inc. ("Evans") and E.L. Spencer, Jr. ("Spencer") entered into a Management Agreement whereby Evans agreed to manage the Briarcliff South Apartments in Jackson, Mississippi, which Spencer owned. (Management Agreement, attached as Ex. 4 to Pl.'s Mot. and as Ex. A to Def.'s Mot., at 1.) Pursuant to the Management Agreement, Spencer agreed,

> [t]o indemnify, defend, and save Evans harmless from all suits in connection with the premises and from liability for damage to property and injuries to or death of any employee or other person whomsoever, and to carry at its own expense public liability and workman's compensation insurance naming [Spencer] and Evans and adequate to protect their interests . . . .

(*Id.* at 2.)

After executing the Management Agreement, Spencer purchased a commercial general liability insurance policy ("the Pacific Policy") from Pacific Insurance Company, Inc. ("Pacific"). (Pl.'s Br. at 3; Def.'s Br. at 2.) The Pacific Policy insured Spencer, doing business as Briarcliff South Apartments, and "[a]ny person . . . or any organization while acting as [Briarcliff South Apartment's] real estate manager." (The Pacific Policy, attached as Ex. B to Def.'s Mot., at 5 § II(2)(b).) The Pacific Policy had a liability limit of $1,000,000 per occurrence and provided coverage from May 23, 1997, to May 23, 1998.

Spencer also purchased an insurance policy from Plaintiff ("the Scottsdale Policy"). (The Scottsdale Policy, attached as Ex. 3 to Pl.'s Mot. and as Ex. C to Def.'s Mot., at "Declarations" page.) The Scottsdale Policy specifically named Spencer as the only insured. (*Id.*) However, the Scottsdale Policy provided that it, generally, "follows the terms, conditions, exclusions, definitions, and endorsements of the [Pacific Policy]." (*Id.* at 1.) Like the Pacific Policy, the Scottsdale Policy had a liability limit of $1,000,000 per occurrence and provided coverage from May 23, 1997, to May 23, 1998. (*Id.* at "Declarations" page.)

After executing the Management Agreement, Evans purchased a commercial insurance policy from Defendant ("the Safeco Policy"). The Safeco Policy named only Evans as the insured and provided coverage from April 30, 1997, to April 30, 1998. (The Safeco Policy, attached as Ex. 1 to Pl.'s Mot. and as Ex. D to Def.'s Mot., at "Commercial Policy Common Declarations" page.) The Safeco Policy had a liability limit of $1,000,000 per occurrence. (*Id.* at "Additional Declarations" to "Commercial General Liability Coverage Part" page.)

On June 10, 1998, Theophilus Mason ("Mason") filed a lawsuit in the Circuit Court of the First Judicial District, Hinds County, Mississippi, alleging negligence against, among others, Spencer and Briarcliff South Apartments ("the Mason lawsuit"). (Pl.'s Mot., Ex. 5). In his second amended complaint ("the underlying second amended complaint"), Mason added Evans, among others, as a defendant. (The Underlying Second Am. Compl., attached as Ex. 6 to Pl.'s Mot. and as Ex. F. to Def.'s Mot.)[3] The underlying second amended complaint alleges that on February 12, 1998, Matthew McNair shot Mason in both legs on the premises of Briarwood South Apartments, where Mason was then

---

**3.** The Underlying Second Amended Complaint is styled *Mason v. Briarcliff South Apartments, et al.,* Civil. Action No. 251–98– 725, Circuit Court of the First Judicial District, Hinds County, Mississippi.

a tenant. (The Underlying Second Am. Compl. ¶¶ 9, 11.)

Mason settled the Mason lawsuit for $1,400,000. (Def.'s Mot., Ex. G.) Pacific contributed $1,000,000 to the settlement pursuant to the Pacific Policy. (Pl.'s Br. at 8; Def.'s Br. at 5.) Plaintiff contributed the remaining $400,000. (Haldiman Aff., attached as Ex. 8 to Pl.'s Mot.) Plaintiff asked Defendant to contribute to the $400,000 that it paid to settle the Mason lawsuit, but Defendant refused. (Pl.'s Mot., Exs. 15–17.)

On September 9, 1999, Plaintiff filed a Complaint for Declaratory Judgment against Defendant in this court. In its Second Amended Complaint For Declaratory Judgment, Plaintiff alleges that the Scottsdale Policy was excess to the Safeco Policy and, therefore, the Safeco policy should have paid up to its liability limit toward the settlement of the Mason lawsuit before the Scottsdale Policy contributed to the settlement. (Pl.'s Second Am. Compl. For Declaratory J. ¶ 13.) Accordingly, Plaintiff seeks a declaration that Defendant must indemnify it for the $400,000 that it contributed to settle the Mason lawsuit. (Id. ¶ 25.) Plaintiff also requests interest, attorney's fees, and costs. (Id. ¶ 26.)

## DISCUSSION

The issue in this lawsuit is whether the Scottsdale Policy has priority over the Safeco Policy in contributing to the settlement of the Mason lawsuit the $400,000 that exceeded the liability limit of the Pacific Policy. The resolution of this issue is a matter of law. Because the Parties do not dispute the material facts, this lawsuit is ripe for summary judgment.

Plaintiff characterizes the Scottsdale Policy as an umbrella policy and the Safeco Policy as a primary policy with an excess provision. (Pl.'s Br. at 11–15; Pl.'s Reply at 3–4.) Plaintiff argues that under Alabama law an umbrella policy is the last policy to pay. (Pl.'s Br. at 12–14.) Therefore, according to Plaintiff, the liability limit of the Safeco Policy should have been exhausted before the Scottsdale Policy contributed to the settlement of the Mason lawsuit. (Id. at 10.)

Defendant agrees that the Safeco Policy is a primary policy with an excess provision. (Def.'s Br. at 6–9; Def.'s Resp. at 2–5; Def.'s Reply at 2–5.) However, Defendant characterizes the Scottsdale Policy as an excess policy. (Def.'s Br. at 6–9; Def.'s Resp. at 2–5; Def.'s Reply at 2–5.) Defendant argues that the language of the "other insurance" clauses in the Scottsdale Policy and the Safeco Policy indicates that, under the circumstances presented by the Mason lawsuit, the Parties intended for the Scottsdale Policy to pay before the Safeco Policy paid. (Def.'s Br. at 6–9; Def.'s Resp. at 2–5; Def.'s Reply at 2–5.) Therefore, Defendant contends that the Scottsdale Policy properly contributed the $400,000 balance to the settlement of the Mason lawsuit. (Def.'s Br. at 6–9; Def.'s Resp. at 2–5; Def.'s Reply at 2–5.)

Because the court finds that the disposition of this lawsuit turns on the characterization of the relevant policies, the court will first characterize the Scottsdale Policy and the Safeco Policy. As discussed, the parties agree that the Safeco Policy is a primary policy with an excess provision. For purposes of characterization, the only dispute is whether the Scottsdale Policy is an umbrella policy or an excess policy. (Def.'s Resp. at 2.)

■ Both umbrella and excess liability insurance policies serve to augment primary comprehensive general liability insurance coverage. See Mitchell F. Dolin, *Excess Defense Coverage and Long–Tail Liabilities*, 32 Tort & Ins. L.J. 875, 877 (1997). Umbrella policies and excess policies serve related but distinct purposes. See id. Umbrella policies generally provide the broadest insurance coverage available. See Howard Ende, Eugene R. Anderson & Susannah Crego, *Liability Insurance: A Primer for College and University Counsel*, 23 J.C. & U.L. 609, 668 (1997). As such, umbrella policies serve dual functions: (1) to act as excess insur-

ance in situations where comprehensive general liability or other primary coverage limits have been exhausted; and (2) to drop down and pay claims that fall outside of the coverage provided by the insured's primary insurance program. *See Garmany v. Mission Ins. Co.*, 785 F.2d 941, 948 (11th Cir.1986); Dolin, *supra,* at 877.

■ Like umbrella policies, excess policies provide excess insurance in situations where primary limits have been exhausted. However, excess policies differ from umbrella policies in two significant ways. First, unlike umbrella policies, excess policies do not provide broader insurance coverage than the relevant primary policies. *See* Dolin, *supra,* at 878; Ende, Anderson & Crego, *supra,* at 675. Instead, excess policies are typically following-form instruments that incorporate by reference the terms of the underlying policies unless there is a specific term to the contrary in the excess policy. *See* Dolin, *supra,* at 878; Ende, Anderson & Crego, *supra,* at 675. Second, excess policies do not have a drop-down feature whereby they act as primary insurance policies for occurrences not covered by the primary policies. *See* Ende, Anderson & Crego, *supra,* at 676.

The court will analyze the Scottsdale Policy in light of these principles.

■ Under its "Declarations" page, the Scottsdale Policy is entitled "Excess Liability Policy." (Pl.'s Mot., Ex. 3.) Similarly, the document describing the terms of the Scottsdale Policy is entitled "Excess Liability Coverage Form." (*Id.*) Although properly characterizing an insurance policy as an umbrella policy or an excess policy turns on the policy's terms, not its title, *see* Ende, Anderson & Crego, *supra,* at 676, the manner in which Plaintiff has labeled the Scottsdale Policy makes the court suspicious of Plaintiff's contention that the Policy is an umbrella policy. The terms of the Scottsdale Policy confirm the court's suspicion for two reasons.

First, the Scottsdale Policy provides that it generally follows the form of the "'Underlying Insurance.'" (Pl.'s Mot., Ex. 3.) "This Policy is excess insurance and, except as otherwise stated in this Policy, follows the terms, conditions, exclusions, definitions, and endorsements of the 'Underlying Insurance' described in ITEM 5. of the Declarations." (*Id.*) The "DEFINITIONS" section of the Scottsdale Policy provides that "'Underlying Insurance' means any policy or policies of insurance listed in ITEM 5. of the Declarations including any renewal or replacement of such policies." (*Id.*) ITEM 5 of the Declarations states "See Schedule of Underlying Insurance." (*Id.*) The Schedule of Underlying Insurance lists Pacific as the only insurer and May 23, 1997, to May 23, 1998, the policy period of the Pacific Policy, as the policy period applicable to that insurer. (*Id.*) Therefore, the Pacific Policy is the "Underlying Insurance." Furthermore, the Scottsdale Policy states that "[w]here any terms of this Policy conflict with any terms of the 'Underlying Insurance,' the terms of this Policy shall apply." (*Id.*) In other words, the Scottsdale Policy follows the form of the Pacific Policy, except in specific situations. Accordingly, the court finds that the Scottsdale Policy satisfies the first criteria of an excess policy. *See* Dolin, *supra,* at 878; Ende, Anderson & Crego, *supra,* at 675.

Second, nothing in the Scottsdale Policy indicates, and Plaintiff does not argue, that it has a drop-down feature whereby it acts as a primary insurance policy for occurrences not covered by the Pacific Policy. In fact, under its "COVERAGE" section the Scottsdale Policy states, "We will pay on behalf of the insured those sums in excess of the 'Underlying Insurance' which the insured becomes legally obligated to pay as damages arising out of an occurrence or accident during the policy period stated in ITEM 2. of the Declarations (the POLICY PERIOD)." (Pl.'s Mot., Ex. C.) Significantly, the "COVERAGE" section also provides that "[w]e have no other obligation or liability to pay sums or perform services, except [to provide a supplementary defense for claims covered by the Policy]." (*Id.*) In other words, the Scottsdale Policy does not serve as primary in-

surance for any occurrences. Therefore, the Scottsdale Policy satisfies the second criteria of an excess policy. *See* Ende, Anderson & Crego, *supra*, at 676. Under these circumstances, the court finds that the Scottsdale Policy is an excess policy, not an umbrella policy. The court will now determine whether the Scottsdale Policy has priority over the Safeco Policy in contributing to the settlement of the Mason lawsuit.

In *National Indemnity Co. v. Bankhead Forest Industries*, 344 So.2d 479 (Ala. 1977), Bankhead Forest Industries ("Bankhead") and Marshall Frost ("Frost") entered into a lease agreement whereby Frost leased to Bankhead a 1967 Kenworth tractor. *See* 344 So.2d at 479–80. As amended, the lease agreement provided that Frost would provide Bankhead with a temporary substitute vehicle during any repair of a vehicle which might be rendered unserviceable. *See id.* at 480. The lease agreement also required Frost to purchase and maintain public liability insurance for the protection of Bankhead and its drivers. *See id.* The lease agreement required that the liability insurance have limits of at least $100,000 for injury to or death of one person and $300,000 for injury to or death of all persons killed in the same accident. *See id.*

Pursuant to the lease agreement, Frost provided the requisite amount of insurance by means of a combination of two policies. *See id.* The first policy was a primary policy issued by Bituminous Casualty Corporation ("Bituminous"), policy No. 12369. *See id.* Bituminous policy No. 12369 had a liability limit of $10,000 per person and $20,000 per accident. *See id.* at 484. The second policy was an excess policy issued by National Indemnity Company ("National"). *See id.* at 480. The National policy had a liability limit of $90,000 per person and $280,000 per accident. See id. at 484. Bituminous policy No. 12369 and the National policy each listed the 1967 Kenworth tractor in their schedule of automobiles. *See id.* at 480.

The 1967 Kenworth tractor was later involved in an accident and was heavily damaged. *See id.* Pursuant to the lease agreement, Frost furnished Bankhead a 1972 GMC tractor while the Kenworth tractor was being repaired. *See id.* While it was being operated by Theo Jackson Lovett ("Lovett"), a Bankhead employee, the GMC tractor was involved in an accident with an automobile driven by Nina G. Morrow ("Morrow"). *See id.* In the accident, Morrow was injured and her son was killed. *See id.* Morrow and her husband filed separate lawsuits against Bankhead and Lovett. *See id.* In those lawsuits, judgments totaling $50,000 were rendered in favor of the Morrows. *See id.*

Bituminous admitted that its policy No. 12369 covered the claim brought by Mr. Morrow. *See id.* Accordingly, Bituminous paid both judgments and then filed a lawsuit seeking contribution or indemnity from National for the $30,000 that exceeded the liability limit of Bituminous policy No. 12369. *See id.* National denied coverage. *See id.*

National filed a counterclaim alleging that at the time of the accident there was in force Bituminous policy No. 12370, which was issued to Frost. *See id.* This policy had liability limits of $10,000 per person and $20,000 per accident and listed the 1972 GMC tractor as one of the insured automobiles. *See id.* National further alleged that Bituminous had also issued policy No. 726121, a general liability policy, to Bankhead, with limits of $100,000 per person and $300,000 per occurrence. *See id.* National argued that the three Bituminous policies provided primary coverage for the Morrow accident and the National policy provided only excess coverage after all limits of liability under the three Bituminous policies were exhausted. *See id.*

The trial court found that the GMC tractor was a "temporary substitute vehicle" under the National policy and, therefore, covered by the National policy. *See id.* at 480–81. The trial court then found that

Bituminous policy No. 12369 and the National policy were written together specifically to cover the operation by Bankhead of trucks rented by it from Frost. *See id.* at 481. As a result, the trial court reasoned that to construe Bituminous policies No. 12370 and No. 726121 so as to require them to share in the liability over the primary limits of Bituminous policy No. 12369 would frustrate and defeat the very reason for requiring the combination coverage by which Bituminous shouldered a portion of the risk and National the balance. *See id.* Therefore, the trial court found that Bituminous could recover from National the balance of the judgments in the Morrow lawsuits that exceeded the liability limit of Bituminous policy No. 12369. *See id.*

On appeal, National argued, in relevant part, that Bituminous policies No. 12370, issued to Frost, and No. 726121, issued to Bankhead, are primary policies and, therefore, had priority over the National policy, an excess policy, in paying that part of the judgments in the Morrow lawsuits that was not paid under Bituminous policy No. 12369. *See id.* at 483. The Alabama Supreme Court disagreed.

In doing so, the Alabama Supreme Court initially discussed the "other insurance" clauses contained in the Bituminous policies. *See id.* at 483–484. However, the Alabama Supreme Court ultimately found the "other insurance" clauses to be irrelevant to the priority issue. *See id.* at 484–85. Instead, the Alabama Supreme Court's holding turned on (1) Frost and Bankhead's intent, as evidenced by the lease agreement, that Frost would be responsible for insuring Bankhead against any liability from accidents arising out of the operation of vehicles leased to Bankhead by Frost and (2) Bituminous and National's willingness to share in insuring Bankhead against such accidents pursuant to Bituminous policy No. 12369 and the National policy. *See id.* at 484–85.

In order to protect Bankhead and its drivers in the operation of the leased vehicles, Frost purchased insurance. Under Bituminous policy No. 12369, Bi-

tuminous was willing to assume a portion of this risk amounting to $10,000 per person and $20,000 per accident. However, Bituminous was not willing to assume the entire risk. Therefore, Bituminous sought another company to assume the remainder of the risk. National Indemnity agreed to assume this portion and wrote its excess policy with a limit of $90,000 per person and $280,000 for each accident.

*Id.* at 484. Accordingly, the Alabama Supreme Court concluded that:

Bituminous policy No. 12369 and the National Indemnity policy were written together to cover the vehicles leased by Marshall Frost to Bankhead Forest Industries and that this combined coverage was for $100,000 for each person and $300,000 for each accident in accordance with the lessor's obligations under . . . the lease agreement.

*Id.* at 485. As a result, the Alabama Supreme Court affirmed the trial court's order directing National to reimburse Bituminous for the balance of the judgments in the Morrow lawsuits that exceeded the liability limit of Bituminous policy No. 12369. *See id.*

■ The material facts in the case at bar are analogous to those in *National Indemnity Co.* Here, Spencer and Evans entered into the Management Agreement whereby Spencer agreed to purchase insurance sufficient to protect Evans against any liability arising from its operation of Briarcliff South Apartments. In so doing, Spencer purchased the Pacific Policy, a primary policy, and the Scottsdale Policy, an excess policy. The court assumes, based on the language of the Management Agreement and the liability limits of the policies, that the combined liability limits of the Pacific Policy and the Scottsdale Policy were "adequate to protect [Evans] interests" while managing Briarcliff South Apartments. (Management Agreement at 2.)

Furthermore, both of these policies named, directly or indirectly, Briarcliff

South Apartments, the property involved in the Mason lawsuit, and Evans, the manager of Briarcliff South Apartments, as insureds. In addition, these policies have the same policy period, May 23, 1997, to May 23, 1998. Under these circumstances, the Pacific Policy is materially identical to Bituminous policy No. 12369 and the Scottsdale Policy is materially identical to the National policy at issue in *National Indemnity Co. See* 344 So.2d at 485. Therefore, this court, like the *National Indemnity Co.* court, finds that the Pacific Policy and the Scottsdale policy were written together to protect Evans pursuant to the Management Agreement.

As such, regarding occurrences covered under the Pacific Policy and the Scottsdale Policy, such as the occurrence leading to the Mason lawsuit, the court finds that the intention of Pacific and Plaintiff was that the Scottsdale Policy would have priority in paying for any liability that exceeded the liability limit of the Pacific Policy. *See id.* Therefore, the Scottsdale Policy properly contributed the $400,000 to the settlement of the Mason lawsuit that exceeded the liability limit of the Pacific Policy.[4] Because the court finds that the Scottsdale Policy has priority in paying for any liability that exceeds the liability limit of the Pacific Policy, Plaintiff's claims must fail and Defendant's claims must succeed.

### ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Plaintiff's Motion For Summary Judgment be and the same is hereby DENIED. It is further ordered that Defendant's Motion For Summary Judgment be and the same is hereby GRANTED. A judgment in accordance with this Memorandum Opinion shall be entered separately.

---

4. In arguing that the Scottsdale Policy does not have priority over the Safeco Policy, Plaintiff relies on *Independent Fire Insurance Co., Inc. v. Mutual Assurance, Inc.*, 553 So.2d 115 (Ala.1989). (Pl.'s Br. at 12–14.) In *Independent Fire*, the Alabama Supreme Court, adopting the majority rule, held that, as between an umbrella policy and a primary policy with an excess clause, the umbrella policy is the last to contribute to the settlement of a lawsuit.

*Independent Fire* is materially distinguishable from the case at bar by the fact that that case involved an umbrella policy, not an excess policy. In fact, the *Independent Fire* court distinguished *National Indemnity Co.* on the ground that it "did not involve an umbrella policy." *Independent Fire Ins. Co., Inc.*, 553 So.2d at 117.